**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ALAN MARBAKER; CAROL MARBAKER; JERRY L. CAVALIER; and FRANK HOLDREN,

    Plaintiffs,

v.

STATOIL USA ONSHORE PROPERTIES, INC. n/k/a EQUINOR USA ONSHORE PROPERTIES INC.

    Defendant.

No. 3:17-CV-001528

(JUDGE CAPUTO)

## **MEMORANDUM**

Presently before this Court is a Motion to Dismiss (Doc. 32) filed by Defendant Statoil USA Onshore Properties, Inc. ("Statoil"). Because Plaintiffs Alan Marbaker, Carol Marbaker, Jerry L. Cavalier, and Frank Holdren ("Plaintiffs") request declaratory relief for a hypothetical scenario that calls upon the court to render an advisory opinion, Count I of their Amended Complaint is not ripe and will be dismissed without prejudice for lack of jurisdiction. Count II of the Amended Complaint fails to state a claim that a declaration that Plaintiffs' Oil and Gas leases with Statoil permit class arbitration is proper and will be dismissed with prejudice. Defendant's Motion to Dismiss will be granted on both counts.

## **I. Background**

The facts as alleged in the Amended Complaint are as follows:

Each of the Plaintiffs entered into Paid-Up Oil and Gas Leases with companies in which Statoil acquired a thirty-two and a half percent (32.5%) interest some time before November 2008. Am. Compl. ¶¶ 22-26, ECF No. 31. Such leases were held by many individuals in the region. An SEC filing by Statoil ASA, for which Statoil was a subsidiary at the time, shows that as of November 2008, Statoil had an interest in at least 32,000 oil and gas leases in Pennsylvania, West Virginia, New York, and

Ohio. *Id.* ¶ 26. Several lessors, including Plaintiffs, have alleged Statoil breached their leases by underpaying royalties. The factual circumstances surrounding this action ("*Marbaker* action") are related to a similar action brought against Statoil by separate plaintiffs in a separate proceeding ("*Canfield* action"), as discussed below.

**A.    The *Marbaker* Action:**

On April 2, 2015, Plaintiffs filed a class arbitration demand against Statoil, alleging Statoil systematically underpaid oil and gas royalties in violation of its Lease agreements. *Id.* ¶ 27. Plaintiffs sought to represent "[A]ll other lessors who entered into a lease in the Marcellus Region in which Statoil has acquired an interest that, by its terms, requires royalties to be calculated based on 'revenue realized' or 'gross proceeds' and who, within the past six years, have received royalty payments from Respondent."[1]   *Id.* ¶ 29. Concurrently with the arbitration action, Plaintiffs filed a declaratory action in this Court to determine whether their Lease agreements permitted class action arbitration. *See Marbaker v. Statoil USA Onshore Properties, Inc.*, No. 15-700 (M.D. Pa. Apr. 9, 2015).

By June 2015, Plaintiffs executed a mediation protocol with Statoil and agreed to dismiss their declaratory action, which was subsequently dismissed without prejudice on June 5, 2015. *Id.* ¶¶ 29, 39. Plaintiffs allege mediation lasted approximately two years and required considerable effort analyzing the claims and damages—at least two thousand hours—by Plaintiffs' counsel and expert. *Id.* ¶¶ 41, 45. Plaintiffs allege the parties met in-person three times and engaged in "significant exchanges" with Statoil's counsel before, between, and after each mediation session.

---

[1]      Plaintiffs proposed an alternative class that included "[o]ther lessors who entered into leases in which Respondent acquired an interest with the royalty payment terms of the [claimants'] leases attached hereto . . . and who, within the last six years, have received a royalty payment from the respondent." *Id.*

*Id.* ¶¶ 42–44. At some point after filing their motion to dismiss in the *Canfield* action, Statoil "abandoned" settlement discussions with Plaintiffs. *Id.* ¶ 49.

On August 25, 2017, Plaintiffs re-filed their federal declaratory action. Shortly thereafter, in late September 2017, Statoil demanded that Plaintiffs destroy information they received during the mediation process. *Id.* ¶ 54.

**B.   The *Canfield* Action:**

In January 2016, a set of leaseholders ("*Canfield* Plaintiffs") brought a class action lawsuit against Statoil that raised almost identical claims as those in the *Marbaker* arbitration. *Canfield v. Statoil USA Onshore Properties, Inc.*, No. 16-85 (M.D. Pa. Mar. 22, 2017). The *Canfield* Plaintiffs, unlike the *Marbaker* Plaintiffs, were able to proceed in federal court because their leases did not contain an arbitration clause.

Statoil moved to dismiss the *Canfield* action. *Id.* Judge Mannion, presiding over the case, dismissed the majority of the claims alleged. However, the *Canfield* Plaintiffs were left with at least one viable claim. *Id.* This triggered settlement discussions between Statoil and the *Canfield* Plaintiffs. On July 19, 2017, counsel for the *Marbaker* Plaintiffs reached out to counsel for the *Canfield* Plaintiffs and offered to coordinate settlement discussions, but counsel for the *Canfield* Plaintiffs rejected this offer. Am. Compl. ¶ 53.

By October 2017, the *Canfield* Plaintiffs reached an agreement in principle to settle the case. On March 27, 2018,[2] the *Canfield* Plaintiffs moved for preliminary approval of their negotiated class-wide settlement. *Id.* ¶ 59. The *Marbaker* Plaintiffs have filed objections to the proposed settlement. Objrs.' Mem. in Opp. to Mot. for Prelim. Approval of Proposed Settlement, *Canfield*, No. 16-85 (Apr. 10, 2018).

---

[2]   One day earlier, on March 26, 2018, Statoil had a teleconference with the *Marbaker* Plaintiffs and agreed that the *Marbaker* action should continue to be stayed. Statoil did not discuss the proposed settlement in the *Canfield* action. Am. Compl. ¶¶ 58, 71.

3

**C. Procedural History**

On August 25, 2017, the *Marbaker* Plaintiffs, as stated above, filed a new Complaint renewing its request for a declaration that they may proceed as a class in arbitration. Am. Compl. ¶ 1. Thereafter, on October 6, 2017, Statoil filed a Motion to Stay the proceeding until the case, *Chesapeake Appalachia, L.L.C. v. Scout Petroleum LLC*, which involved a dispute over whether similar language in an arbitration clause for an oil and gas lease allowed for class arbitration, was decided by the Third Circuit. No. 17-2037, slip op. 749 (3d Cir. Mar. 13, 2018) ("*Scout II*"); *see also* Def.'s Mot. to Stay, ECF No. 11. This Motion was granted on November 21, 2017. Mem. Order, ECF No. 16. On March 30, 2018, the *Marbaker* Plaintiffs filed a Motion to Consolidate the *Marbaker* and *Canfield* actions which was subsequently denied on June 14, 2018. Doc. 18, ¶ ¶ 18, 43.

Shortly after the Third Circuit decided *Scout II*, Statoil filed a Motion to Dismiss the Complaint, which was later terminated after the *Marbaker* Plaintiffs filed an Amended Complaint on May 1, 2018. The Amended Complaint requested declaratory relief on two counts: (1) that Statoil waived its right to enforce the arbitration clauses in their leases by "invoking judicial machinery" and (2) that class arbitration is available under their Leases. *See* Am. Compl., *generally*. Statoil filed a new Motion to Dismiss on May 15, 2018. *See* Doc. 32, *generally*. This Motion has been fully briefed and is ripe for review.

## II. Legal Standards

**A. Motion to Dismiss: Rule 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. *See* FED. R. CIV. P. 12(b)(6). When considering a Rule 12(b)(6) motion, the Court's role is limited to determining if a plaintiff is entitled to offer evidence in

support of their claims. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000). The Court does not consider whether a plaintiff will ultimately prevail. *Id*. A defendant bears the burden of establishing that a plaintiff's complaint fails to state a claim. *See Gould Elecs. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000).

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). The statement required by Rule 8(a)(2) must give the defendant fair notice of what the . . . claim is and the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Detailed factual allegations are not required. *Twombly*, 550 U.S. at 555. However, mere conclusory statements will not do; "a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Instead, a complaint must "show" this entitlement by alleging sufficient facts. *Id*. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009). As such, "[t]he touchstone of the pleading standard is plausability." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element. *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679.

In deciding a motion to dismiss, the Court should consider the allegations in the

5

complaint. In addition to the allegations found in the complaint, the court may examine "exhibits attached to the complaint, matters of public record," and "legal arguments presented in memorandums or briefs and arguments of counsel." *Mayer*, 605 F.3d at 230; *Pryor*, 288 F.3d at 560. Additionally, the Court may consider a "document integral or explicitly relied upon in the complaint." *In Re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (Alito, J.).

### III. Discussion

**A. Justiciability**

The United States Constitution limits federal court jurisdiction to "cases" and "controversies." U.S. CONST. ART. III, § 2. *See also Presbytery of New Jersey v. Florio*, 40 F.3d 1454, 1462 (3d Cir. 1994) ("The existence of a case an controversy is a prerequiste to all federal actions, including those for declaratory or injunctive relief."); *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 410 (3d Cir. 1992) (explaining constitutional limitations on federal court jurisdiction including the case and controversy requirement). While the scope of the ripeness doctrine has proven difficult to articulate with precision, "in some circumstances, the ripeness requirement is drawn from Article III limitations on judicial power." *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 341 (3d Cir. 2001). In the declaratory judgment context, which involves the "discretionary power to determine the rights of parties before injury has actually happened," an unripe case does not present an actual case or controversy. *Step-Saver Data Sys., Inc. v. Wyse Tech*, 912 F.2d 643, 647 (3d Cir. 1990).

When assessing ripeness, "the question in each case is whether the facts, as alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to

6

warrant the issuance of a declaratory judgment." *Maryland Cas. Co.*, 312 U.S. 270, 273, 61 S.Ct. 510 (1941). In *Abbott Laboratories v. Gardner*, the Supreme Court identified two principal considerations for resolving a ripeness question: (1) "the fitness of the issues for judicial decision" and (2) the "hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507 (1967) *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980 (1977). The Third Circuit has refined these considerations with respect to declaratory judgments into a three-part analysis: (1) "adversity of the interest of the parties"; (2) "conclusiveness of the judicial judgment"; and (3) "practical help, or utility, of that judgment." *Step-Saver*, 912 F.2d at 647.

### 1. Adversity of Interest

"Courts have found insufficient adversity for ripeness where the chance of the defendant acting against plaintiff is but a 'contingency.'" *NE Hub Partners*, 239 F.3d at 343. *See also Presbytery*, 40 F.3d at 1463 ("[W]here intervening events remove the possibility of harm, the court must not address the now-speculative controversy.") (quoting *Salvation Army v. Dep't of Cmty. Affairs*, 919 F.2d 183, 192 (3d Cir. 1990)); *Armstrong*, 961 F.2d at 416 (determining the case was unripe because defendants' requested declaration was contingent upon whether the directors would actually act upon the expanded fiduciary duties provision in the future).

Count I of Plaintiffs' Amended Complaint requests a declaration that Statoil "has waived the right to enforce the arbitration provision in Plaintiffs' lease." Am. Compl. ¶ 108. The facts as pleaded in Plaintiffs' amended complaint do not establish that Statoil seeks or has sought to enforce the arbitration provision against them. Instead, the requested declaration appears to be a mechanism to seek protection in the event that the *Canfield* settlement is not approved:

> *[I]f* the settlement is not approved, SOP will argue that Plaintiffs' claims must be heard in arbitration and that there cannot be a class arbitration.

7

> In short, SOP is invoking the federal judicial process to obtain an order for its benefit gutting Plaintiffs' claims while seeking to *keep arbitration as a fallback position if* its effort in *Canfield* fails.

*Id*. ¶ 66 (emphasis added). Plaintiffs essentially admit the requested relief would not have any effect on their position in the event that the *Canfield* settlement is approved:

> [T]hrough federal court approval of the *Canfield* settlement, SOP seeks to extinguish Plaintiffs' claims, to eliminate Plaintiffs' arbitration action, and to eliminate arbitration as a viable forum in which to resolve Plaintiffs' class claims.

*Id.* This acknowledges that Statoil might not seek to enforce its right to arbitrate in such a scenario.

Plaintiffs' requested declaration is like that of the plaintiff in *Step-Saver*. The plaintiff, Step-Saver, who sold packaged computer systems to clients, sued the defendants, their hardware and software suppliers, after several of Step-Saver's clients sued Step-Saver alleging their products malfunctioned. *Step-Saver*, 912 F.2d at 645, 646. Step-Saver requested a declaration that the defendant would be responsible for any liability plaintiffs had to its customers in the pending suits against them. *Id.* at 646. The Third Circuit dismissed this request for declaratory relief as unripe, emphasizing the contingent nature of Step-Saver's requested declaration, namely that "[t]he main problem with this request lies in its first word, 'if.'" *Id.* at 647. Similarly, the *Marbaker* Plaintiffs' requested declaration in Count I relies on a scenario that is not immediate and would require the happening of both the rejection of the *Canfield* settlement and an attempt by Statoil to enforce the arbitration provision in the leases to come to fruition. Accordingly, there is presently insufficient adversity of interest in Plaintiff's requested declaration.

    2.    *Conclusivity*

Conclusivity involves evaluating "whether the parties' rights will be definitely decided by a declaratory judgment." *Id.* at 649 n.9. This second ripeness inquiry "requires us to determine whether judicial action at the present time would amount to

8

more than an advisory opinion based upon a hypothetical set of facts." *Presbytery*, 40 F.3d at 1468.

While the Third Circuit has found that predominantly legal questions require less factual development to satisfy the conclusivity inquiry, Plaintiffs' requested declaration is not predominantly legal. *But see Armstrong*, 961 F.2d at 412 ("[E]ven where the need for a concrete set of facts is not as great, the case or controversy requirement must be met."). The cases found to involve predominantly legal questions often concern constitutional or administrative law issues involving state actors. *See NE Hub Partners*, 239 F.3d at 344 (discussing how cases involving governmental preemption questions raise primarily legal issues). By contrast, the requested declaration in the *Marbaker* action requires a fact-based determination that Statoil's "invo[cation of] judicial machinery in an attempt to stop Plaintiffs' arbitation and undermine their claims" is sufficient to constitute a waiver of its right to enforce the arbitration provision. Am. Compl. ¶ 108.

Because of the factual nature of Plaintiff's requested declaration, further factual development would be needed to prevent the court from issuing an advisory opinion on the presently hypothetical factual scenario. *Id.* Moreover, even if Plaintiffs' claims were sufficiently legal to warrant less conclusivity of fact, the overtly contingent nature of their complaint would undermine a favorable conclusion under this second inquiry. *Armstrong*, 961 F.2d at 421.

   3.   *Utility*

To be ripe, a useful purpose must be served by the requested declaration. *Step-Saver*, 912 F.2d at 649. The contingent nature of Plaintiffs' requested relief and need for further factual development of the Amended Complaint weigh against finding that a useful purpose would be served by the court entering judgment on the complaint at

9

this stage.

In addition to a useful purpose, the utility factor analyzes "'whether the parties' plans of actions are likely to be affected by a declaratory judgment,' and considers the hardship to the parties of withholding judgment." *NE Hub Partners*, 239 F.3d at 344-345 (quoting *Step-Saver*, 912 F.2d at 649 n.9). While Plaintiffs' declaration may have an effect on both the Plaintiffs' and Statoil's actions regarding future arbitration and litigation, time-saving alone has not been considered to be enough "to justify review in a case that would otherwise be unripe." *Id.* at 345 (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 735, 118 S.Ct. 1665 (1998)). Further, the degree to which this declaration would affect the parties' behavior is not enough to tip the balance in favor of finding Count I ripe, especially in light of its deficiencies on the other ripeness factors discussed above. *See Armstrong*, 961 F.2d at 423 ("This case is therefore unlike the ripeness cases in which individuals faced a 'Hobson's choice' of foregoing lawful behavior or subjecting themselves to prosecution under the challenged provision."). Accordingly, Count I is not ripe and this Court lacks subject matter jurisdiction to hear it at this time.

**B.     Arbitration Provision in Lease**

To determine whether class arbitration is available, courts evaluate two distinct questions: (1) whether a court or an arbitrator may determine the availability of class arbitration and (2) "whether the parties' arbitration agreement permits class arbitration." *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 753 (3d Cir. 2016) . Count II of Plaintiffs' Amended Complaint concerns this second question by seeking a declaration that "class arbitration is in fact available under [*Marbaker* Plaintiffs'] leases, the circumstances of their negotiation, and the parties' course of conduct." (Am. Compl. ¶ 112).

The Supreme Court addressed this second question in *Stolt-Nielsen v. AnimalFeeds Int'l Corp.*, which also involved an arbitration clause that was silent on the availability of class arbitration. 559 U.S. 662, 672, 130 S.Ct. 1758 (2010).[3] The Court concluded "the differences between bilateral and class-action arbitration are too great for arbitrators to presume . . . that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings." *Id.* at 687. *Stolt-Nielson* therefore frames the issue underlying this second question of class arbitration availability as "whether the parties *agreed to authorize* class arbitration." *Id.*

Notably, the Third Circuit recently addressed the very issue raised in Count II of Plaintiffs' Amended Complaint in an unreported opinion, *Scout II*. Slip op. at 750. *Scout II* is even situated in the same factual context as the *Marbaker* case. Relying on the Supreme Court's decision in *Stolt-Nielson*, the Third Circuit found that the arbitration clause in the oil and gas lease at issue, which was silent "with regard to an express agreement to permit class arbitration[,]" could not be read to allow class action arbitration. *Id.* at 750, 752. Even after "assuming that class arbitration may be permitted without express authorization in the contract," the Court found nothing in the contract that suggested an intent to allow class arbitration. *Id.* at 751. Indeed, the language of the contract, which employed transaction-specific language, actually undermined the plaintiff's argument that the parties intended to allow class arbitration despite the arbitration clause's silence on that issue. *See Scout II*, slip op. at 751 (providing an example of such transaction-specific contract language, "[i]n the event

---

[3] That the parties in *Stolt-Nielson* stipulated their arbitration provision was silent on the issue of class arbitration does not distinguish it from the *Marbaker* action. *Stolt-Nielson*, 550 U.S. at 668-69, 130 S.Ct. 1758. A simple review the arbitration clauses at issue in the *Marbaker* case reveals that the parties included no language on the issue of class arbitration, thereby rendering the arbitration clauses at the very least facially "silent" on this issue.

of a disagreement *between Lessor and Lessee* . . .").

Plaintiffs have attempted to distinguish *Scout II* from their case to argue that it should not control the outcome of the Motion to Dismiss.[4] First, Plaintiffs attempt to distinguish *Scout II* on a factual level, arguing that Plaintiffs' leases are not identical to those in *Scout II*. Second, Plaintiffs argue that unlike *Scout II*, the conduct of the parties in the *Marbaker* action reveals latent ambiguities in the arbitration clauses and parole evidence should be entertained because it shows that the parties intended to allow class arbitration. In the alternative, Plaintiffs argue that course of performance evidence is always admissible and that the parties' course of performance shows they intended the arbitration clauses permit class action arbitration. Pls.' Br. 28-29, ECF No. 44.

*1. Factual Comparison*

Each of Plaintiffs' five leases can be classified into one of two categories: (1) leases with identical arbitration clauses to that in *Scout II* ("Group 1") and (2) leases with slightly different language from *Scout II* ("Group 2").

---

[4] Additionally, Plaintiffs appear to argue Count II should not be decided until the Supreme Court decides *Lamps Plus, Inc. v. Varela*. 138 S.Ct. 1697 (2018). *Varela* presents a different question from that posed here; namely, whether an arbitration agreement, which utilizes standardized arbitration language and is not governed by *Stolt-Nielsen*, can be read to permit class arbitration where the contract language is silent on the issue. *Varela v. Lamps Plus, Inc.*, No. 16-5608, slip op. 670, 673 (9th Cir. Aug. 3, 2017), *cert. granted sub nom.*, *Lamps Plus, Inc. v. Varela*, 138 S.Ct. 1697 (2018). Moreover, the agreement in *Varela* was executed within the employment context and the arbitration clause contains substantially different language. *Varela v. Lamps Plus, Inc.*, No. 16-577, 2016 U.S. Dist. WL 9110161, at *2 (C.D. Cal. July 7, 2016) *aff'd*, No. 16-5608, slip op. 670 (9th Cir. Aug. 3, 2017) (listing relevant arbitration provisions in the underlying employment agreement, including that it does not "prohibit or limit the parties from seeking injunctive relief in lieu of or in addition to arbitration at any time directly from a court of competent jurisdiction"). Because of these differences, it is not necessary to wait until the Supreme Court has decided *Varela* to make a finding on dismissal of Count II of the Amended Complaint.

The Group 1 Leases—both Marbaker Leases and the first Holdren Lease—contain word-for-word identical arbitration clauses:

> In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

Am. Compl., Exs. A, B, C, Doc 31-1; *see also Scout II*, slip op. at 750. Nevertheless, Plaintiffs argue these clauses are not identical because Paragraph 22 of the addenda to both Marbaker Leases "supercede and modify the arbitration clauses." Pls.' Br. 32, ECF No. 44; *see also* Am. Compl., Ex. A at 7, Ex. B, at 16. This argument misrepresents the addendum language, which simply supplements, rather than supercedes, the arbitration language in the underlying lease. Indeed, the introductory paragraphs of the addenda state "[a]ttached to *and made part of that certain oil and gas lease . . .* [.]" Am. Compl., Ex. A at 7, Ex. B at 16 (emphasis added). For these reasons, the language in the Group 1 Leases is identical to that in *Scout II* and cannot be distinguished on that basis.

The Group 2 Leases—the second Holdren Lease and the Cavalier Lease—employ slightly different arbitration clause language from that in *Scout II*:

> (a) Any controversy or claim arising out of or relating to *this Lease*, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules including the Optional Rules for Emergency Measures of Protection, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.
>
> (b) Arbitration shall take place within One hundred (100) miles of the *leased premises* and *this agreement* shall be governed by and interpreted in accordance with the laws of the State of Pennsylvania. *The parties* acknowledge that *this agreement evidences a transaction* involving interstate commerce. The United States Arbitration Act shall govern the interpretation, enforcement, and proceedings pursuant to the arbitration clause in this agreement.

> (c) *Either party* may apply to the arbitrator seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. *Either party* also may, without waiving any remedy under *this agreement* seek from any court having jurisdiction any interim or provision relief that is necessary to protect the rights or property of that party, pending the establishment of the arbitral tribunal (or Pending the arbitral tribunal's determination of the merits of the controversy)[.]

*Id.*, Ex. D at 37 (emphasis added).[5] Despite these differences, the Group 2 arbitration clauses are similarly silent on the issue of class arbitration and utilize the same kind of transaction-specific language discussed above. *Cf. Stolt-Nielsen*, 559 U.S. 662, 683, 130 S.Ct. 1758 (discussing relevant principles of alternate dispute resolution including that the parties are "'generally free to structure their arbitration agreements as they see fit'" and "parties may specify *with whom* they choose to arbitrate their disputes") (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57, 115 S.Ct. 1212 (1995)).

Because the Group 2 Leases exist within the same factual context as *Scout II* and employ similar transaction-specific language undermining any possible counter-inference that class arbitration was contemplated by the parties, these Leases are also governed by *Stolt-Nielsen* and *Scout II*.

2. *Ambiguity*

Under Pennsylvania Law, "[i]t is firmly settled that the intent of the parties to a written contract is contained in the writing itself." *Krizovensky v. Krizovensky*, 624 A.2d, 638, 642 (Pa. Super. Ct. 1993). When the terms of the contract are clear, "the

---

[5] The quoted language is from the second Holdren Lease. The Cavalier Lease includes almost exactly the same language; the only differences are that at times, the Cavalier Lease uses the term "this Lease" instead of the term "this agreement" from the Holdren Lease, and in paragraph (c), the Cavalier Lease uses the term "any party hereto" instead of "[e]ither party" as used in the Holdren Lease. *Id.*, Exs. D, E.

14

intent is to be discovered only from the express language of the agreement." *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982); *see also Surovcik v. D&K Optical, Inc.*, 702 F. Supp. 1171, 1175 (M.D. Pa. 1988) (noting that Pennsylvania courts apply this approach, the "plain meaning rule," when interpreting contracts). In evaluating a contract for ambiguity, a court will "decide whether there are objective indications that the terms of the contract are subject to different meanings." *Krizovensky*, 624 A.2d at 643. A dispute between the parties over the terms of the contract does not, on its own, evidence ambiguity. *Id.* at 644. Contractual ambiguities may be either patent or latent. *See Samuel Rappaport Family P'ship v. Meridian Bank*, 657 A.2d 17, 22 (Pa. Super. Ct. 1995) (defining patent ambiguity as that which "appears on the face of the contract and is a result of defective or obscure language" and latent ambiguity as that which "arises from collateral facts which make the meaning of the contract uncertain" despite facially clear language in the contract) (quoting *Krizovensky*, 444 A.2d at 642-43).

Plaintiffs attempt to distinguish their case from *Scout II* by arguing that the conduct of the parties and the collective nature of parts of the leases should be considered. Pls. Br. 27. Plaintiffs appear to argue that the arbitration clauses are ambiguous because they are "susceptible of more than one reasonable interpretation." *Id.*

The language of the arbitration clauses is neither defective nor obscure as to its meaning and therefore does not contain a patent ambiguity. *Meridian Bank*, 657 A.2d at 22). Plaintiffs seem to argue there is a latent ambiguity because the arbitration clause could reasonably be interpreted to both allow and foreclose class action arbitration. However, Plaintiffs fail to argue where in the lease there is such an expression of intent.

The Amended Complaint includes numerous facts relating to the conduct of the parties and the collective aspects of the royalty formula that is the subject of the parties' underlying dispute. However, these facts do not blur the meaning of the otherwise facially clear contract language which limits the scope of their arbitration disputes. Am. Compl., Exs. A-E. (using language to limit the parties in the arbitration including "Lessor and Lessee" and "either party" and to limit the scope of the issues, including "arising out of or relating to this Lease"). The formulation of the royalties is done on a collective basis for the leases in the geographic region. This formulation is solely a method to compute or determine payment to the individual lessors and does not establish an intent to resolve all lease disputes collectively. Because there is no ambiguity in the contract, parole evidence relating to conduct of the parties and collective aspects of parts of each lease need not be considered.

### 3. *Course of Performance*

Plaintiffs additionally argue that course of performance evidence may always be considered to determine the parties' intent because it is not barred by the parole evidence rule.[6] The facts used by Plaintiffs to support this course of performance argument concern the circumstances surrounding formation of the lease contracts,

---

[6] Plaintiffs cite only to one case by the Commonwealth Court of Pennsylvania in support of this proposition, *Preston v. Saucon Valley Sch. Dist.* 666 A.2d 1120, 1127 (Pa. Cmmw. Ct. 1995). *Preston* concerns a dispute between a school superintendent and the local school board over whether the newly elected school board owed him money after revoking a series of agreements executed by the previous school board that would have increased his salary. *Id.* at 1121-22. The quote cited by Plaintiffs was from the dissenting opinion and represents only the dissenting judge's view that the trial court should have allowed introduction of course of performance evidence showing the superintendent benefitted from other similar agreements to support his argument that the new school board owed him money under the revoked agreement. *Id.* at 1127. However, this argument was not addressed by the majority, who instead analyzed the question of whether the old board's agreements were binding on the new board. *Id.* at 1124.

specifically, the group-negotiated lease terms and pooling of properties to determine the aggregated formula for paying royalties to lessors. Pls. Br. 29. Notably, Plaintiffs emphasize facts pertaining to Statoil's intent at the time the contracts were negotiated. *See id.*

The term "course of performance" refers to "[a] sequence of previous performance by either party *after an agreement has been entered into*, when a contract involves repeated occasions for performance and both parties know the nature of the performance and have an opportunity to object to it." *Course of Performance*, BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added). Plaintiffs did not plead any facts that occurred after the leases were entered into that shows Statoil intended the arbitration agreement to allow class arbitration.

Even if Plaintiffs could have offered such facts, they would not be determinative on the issue of intent, as the express terms of the agreement are to be given greater weight. *See* 11 WILLISTON ON CONTRACTS § 31:4 (4th ed. 1993 & Supp. 2018) ("While the court may also look to course of performance . . . as well as the surrounding circumstances when the parties entered the contract, primary emphasis should be given to the words used by the parties in their contract or agreement."). Here, as noted above, the express language of the lease is clear.

Plaintiffs' action is not distinct from *Scout II* and is therefore governed by *Stolt-Nielsen* and *Scout II*. Accordingly, I find the arbitration clauses in Plaintiff's leases do not allow for class arbitration.

## IV. Conclusion

For the above stated reasons, Count I of the Amended Complaint will be dismissed without prejudice for lack of subject matter jurisdiction and Count II of the Amended Complaint will be dismissed with prejudice for failure to state a claim.

17

An appropriate order follows.

September 12, 2018 /s/ A. Richard Caputo
Date A. Richard Caputo
United States District Judge